Helen Judge, Plaintiff-Appellant, v. Rockford Memorial Hospital, and Florence W. Erdmier, Defendants-Appellees.

Gen. No. 11,132.

Second District, Second Division.

May 8, 1958.

Released for publication May 26, 1958.

Knight, Ingrassia, Bourland & Roszkowski, of Rockford, for appellant.

Stanley H. Guyer, and Edward J. Enichen, of Rockford, for defendants-appellees.

PRESIDING JUSTICE CROW delivered the opinion of the court.

The plaintiff, Helen Judge, a registered nurse, brought suit against the Rockford Memorial Hospital, a corporation, and Florence W. Erdmier, Director of Nurses at the hospital, charging libel, and seeking to recover damages resulting from a certain alleged libelous letter written by Florence W. Erdmier, as as Director of Nurses, the plaintiff alleging injury in her reputation, and resulting inability to obtain employment. A trial was had before a jury, and at the close of all the evidence, on the defendants' motion for a directed verdict the court allowed the motion, directed a verdict, and entered judgment for the defendants. No questions are raised on the pleadings, and they need not be set forth in detail.

The plaintiff appeals, contending that the alleged writing is libelous on its face, and, therefore, malice is imputed; the writing was not a privileged communication; the question of libel is a question for the jury to determine, and it may be determined from the writ-

369

ing itself as well as from extrinsic evidence; and that the question of malice should have been submitted to the jury under proper instructions.

The defendants contend, inter alia, that the alleged libelous letter is qualifiedly or conditionally privileged, and, hence, even if the communication were libelous per se, the burden was on the plaintiff to prove malice in fact, and since there was no proof, either directly or by any inference most favorable to the plaintiff, of malice in fact, the trial court was not in error in directing a verdict for the defendants.

There are certain other points involved, but in the view we take it will not be necessary to consider them.

The material evidence discloses that the plaintiff, a Registered Nurse, was intermittently engaged as a private duty nurse by various patients of Rockford Memorial Hospital for the period commencing in August or September, 1955 and extending through June 2, 1956, and during those times practiced her profession in the hospital as a private duty nurse. She was a member of the Nurses' Professional Registry, Rockford.

The defendant, Florence W. Erdmier, Director of Nurses at the hospital, was charged with the supervision of all nursing care, including that of private duty nurses, administered to patients in the hospital.

On April 7, April 10, and May 17, 1956, Mrs. Erdmier received from the hospital pharmacist narcotics loss reports, each reporting the loss of one 30cc vial of demerol, a narcotic, on each day. On May 17, 1956, Mrs. Erdmier talked to the pharmacist at the hospital, after the third loss report. She also started checking into the records of the nurses who had been on duty on the floor where the losses occurred.

One of the narcotics loss reports was signed by Adeline Mangiracini, who appeared as a witness for the defendants, and she testified she was employed as

370

general charge nurse on the 3:00 p. m. to 11:00 p. m. shift of May 17, 1956, on a certain floor and that Mrs. Judge was working as a private duty nurse on the same floor at the same time. She said that at the end of her shift she checked the narcotics cabinet and found a vial of demerol missing. The discovery was made around a quarter to eleven p. m. During the course of the evening, earlier, she had occasion to go into the narcotics cabinet and the vials of demerol were all there then. The loss was discovered at the end of the shift. It was customary for the general staff nurse or medication nurse to check the cabinet at the end of each shift.

Mrs. Erdmier then checked the records of the nurses on the floor where the losses occurred. In checking Mrs. Judge's record, among others, she discovered 22 or 23 prior instances where Mrs. Judge had failed properly to record the administration of narcotics to patients which, from the narcotics record, she had withdrawn from the supply on the floor. There were three prior instances where she had improperly failed to record administering demerol to the patient,—on November 24th, and 25th, and December 18, 1955, though having, from the narcotics record, withdrawn demerol from the narcotics cabinet. Mrs. Judge testified she had in fact administered it (or wasted it), but had not recorded the administration on the patient's or nurse's record. Mrs. Judge had withdrawn 6ccs of demerol (and she says administered it) after the doctor had ordered demerol stopped as a medication for one patient, and there were 18 or 20 other prior instances where she had withdrawn codeine, also a narcotic, and had failed to record administering it. Normal hospital operating procedures required that the nurse record on the narcotics record the withdrawal of any narcotic, and then record on the individual patient's record, or nurse's record, the administration thereof to the pa-

371

tient. The plaintiff offered no particular explanation of the at least apparent deficiencies in methods of record keeping, or what happened in those cases where she had withdrawn narcotics but had no record of administering such to patients, or wasting it, except as to the foregoing demerol instances where she said she in fact administered it (or wasted it), but did not record the same. She did deny ever taking any demerol from the hospital. Accurate records and perpetual inventory of narcotics and the handling thereof are obviously necessary for many reasons, including the doctor's information, the patient's welfare, charging the patient, and inspection by the Federal Bureau of Narcotics. Mrs. Judge was an experienced nurse and knew the normal operating procedures.

On May 20, 1956, Mrs. Erdmier called Mrs. Judge into Mrs. Erdmier's office and recounted to her the matter of the demerol reported lost. She pointed out that Mrs. Judge had on prior occasions failed properly to record narcotics and the importance of keeping accurate records of medications given by the nurse. Then Mrs. Erdmier told Mrs. Judge that from then on she would have to have a nurse in attendance when she was withdrawing medication from the narcotics cupboard,—that henceforth, she, Mrs. Judge, was not to go into the narcotics cabinet without some other nurse present. Mrs. Judge responded "that will be all right." She did not at that time offer any protestations or explanations as to her methods of record keeping or the disposition of any questioned narcotics.

Either on June 2, 1956, or shortly thereafter, Mrs. Judge having by then finished a case she had been employed on, Mrs. Erdmier called the Nurses' Professional Registry, Rockford, and asked that Mrs. Judge not be assigned as a private duty nurse to Rockford Memorial Hospital in the future.

372

The Grievance Committee of the Registry then asked Mrs. Erdmier to write a letter, which she did and personally delivered to the Registry. The letter of June 6, 1956, complained of in this case, is the letter written in response to that request. That letter is as follows:

"Miss Eva Carlson
Nurses' Professional Registry
Nelson Hotel
Rockford, Illinois.

Dear Miss Carlson:
This will confirm our conversation of last week relative to Mrs. Helen Judge, R. N.

As I told you over the phone last week, I prefer in the future that Mrs. Judge not be sent on cases at Rockford Memorial Hospital. Over a period of the past three months, we have had three vials of demerol disappear from our locked medicine cabinet on the floor where she was specialing. In two instances the loss occurred on the 3–11 shift while she was on duty, and the other loss occurred on the 7–3 shift when she had changed shifts for a few days. We also had two incidents occur last winter when she charted another medication on her patient's chart but was observed having taken demerol.

I have talked to Mrs. Judge about this loss of demerol and feel that she had a most unusual and abnormal reaction. Since my position makes it imperative for me to consider 'the good of all concerned', I feel that it will be best for Rockford Memorial Hospital not to have Mrs. Judge's services available to us.

This in no way reflects upon the care which Mrs. Judge has given patients in our hospital.
 Sincerely,
 (Mrs.) Florence W. Erdmier
 Director of Nurses"

Mrs. Erdmier's letter was referred by the Nurses' Registry to the Complaint or Grievance Committee of the Private Duty Section thereof. The chairman of that Committee sent out copies of the letter to the members of the Committee and to Mrs. Judge. No copy of the letter was sent to any other person.

Mrs. Judge shortly went to the Nurses' Registry. She instructed Miss Miller of the Registry to take her off of the "on call" list, that being the list of private duty nurses immediately available for service. She has never since asked to be reinstated to the "on call" list of private duty nurses at the Registry, but she was never taken off the Nurses' Registry as such. After the letter Mrs. Erdmier had no further talks with Mrs. Judge, though that does not appear to have been Mrs. Erdmier's fault,—she had made at least two appointments to see her, one of which had to be cancelled because Mrs. Erdmier was ill, and the other, Mrs. Judge did not keep.

The evidence indicates that the Nurses' Professional Registry was the place to be contacted for the purpose of securing private duty nurses. Private duty nurses were not hired by the hospital. The Registry carried a listing of Registered Nurses in Rockford and surrounding communities and when a hospital or private party or physician wished to secure a nurse, the Registry was called. The patients themselves would pay and hire the individual private duty nurses. The purpose of the Nurses' Registry is to provide a centralized call service for private duty nurses, and it is also a nurses distribution center for the community so that families, doctors and nurses, or the hospitals may call for private duty nurses when needed. Mrs. Judge had been a nurse about 20 years, and had become a member of the Registry August 9, 1955, and was listed on the Registry until June 6, 1956, which was the date of the letter. She had been employed twenty-four times

through the Registry. The private duty nurses chose their own chairman, and the chairman appoints the Grievance Committee, to which the letter of June 6, 1956 was referred.

The plaintiff testified that her earnings were $16 a day as a registered nurse for eight hours and that she was unemployed as a registered nurse between June 6, 1956, and March 31, 1957 when she obtained regular employment. She further testified that her earnings between August 9, 1955 and May 31, 1956, were around $2,000.

The plaintiff further testified that she did not know Mrs. Erdmier personally, became acquainted with her as head of nurses at the hospital, had several conversations with her as such, and had a conversation with Mrs. Erdmier in January, 1956 and again in February of that year regarding certain matters, one with regard to a respirator patient, in which Mrs. Erdmier asked her if she was afraid of a respirator case, and another with regard to the hospital's method of charging patients for medications.

The defendant Florence W. Erdmier testified that she was the Director of Nurses, and had occupied that position for ten years, and was in charge of the supervision of the School of Nursing and of the nurses themselves in the hospital. She has an office which is located on the first floor. The second, third, and fourth floors are patients' floors. The narcotics cabinet is located in the center of each of those floors at the indentation in the corridor. There are doors on the front thereof, equipped with a lock, and a box inside in which the narcotics were kept was also equipped with a lock. Normally, both the cabinet and box inside were locked. During the time the plaintiff was on private duty service at the hospital, until the last of May, 1956, the actual practice seems to have been (though there is some dispute in the evidence)

for the key to the cabinet and box to be kept in a drawer in a desk at the nurses station, and a nurse needing narcotics for a patient got the key from the drawer and proceeded to withdraw and administer such. That practice may have been contrary to certain hospital orders and theory, however, as there was an order in effect that the key be carried by the head floor nurse or medication nurse. The narcotics cabinet is located adjacent to the nurses station. She said that after the third loss of demerol occurred May 17, 1956, she took steps to see what could be done to find out where the narcotics were going. 30cc's of demerol was reported missing. She checked the narcotics loss or waste reports with the pharmacist, and they checked the records of the nurses on the floor. The only investigation which was made was of the hospital records. She never called Mrs. Judge in and asked her concerning or accused her of taking demerol or any other narcotic. She based her opinion and actions only on the records that the hospital had. She did not see Mrs. Judge take any demerol from the hospital or talk to anyone who had seen her take demerol from the hospital. She made no effort to bring anything to the attention of the police or narcotics authorities. The hospital pharmacist made a report of loss to the narcotics authorities. There were, normally, about 20 patients on a floor, and the number of nurses varied, usually six or eight being on the day shift, and there normally were one or two interns about.

 A privileged communication is one which, except for the occasion on which or the circumstances under which it is made, might be defamatory and actionable: 33 Am. Jur., p. 123. We believe, under the circumstances, that the letter in question was written on a privileged occasion and is qualifiedly or conditionally privileged. Where circumstances

exist, or are reasonably believed by the defendant to exist, from which he has an interest or duty, or in good faith believes he has an interest or duty, to make a certain communication to another person having a corresponding interest or duty, and the defendant is so situated that he believes, in the discharge of his interest or duty or in the interests of society, that he should make the communication, and if he makes the communication in good faith, under those circumstances, believing the communication to be true, even though it may not be true, then the communication is qualifiedly or conditionally privileged, even though the defendant's interest or duty be not necessarily a legal one but only moral or social and imperfect in character: 33 Am. Jur., p. 124; 33 Ill. L. and P., pp. 390–391. The essential elements are: good faith by the defendant, an interest or duty to be upheld, a statement limited in its scope to that purpose, a proper occasion, and publication in a proper manner and to proper parties only: 33 Am. Jur., p. 125; 33 Ill. L. and P., p. 391. In the absence of actual malice, a communication may be qualifiedly privileged, if the other essential elements are present, even though it is not true, and even though it charges a crime, but a communication loses its character as privileged and is actionable upon proof of actual malice: 33 Am. Jur., p. 126; 33 Ill. L. and P., p. 392. Both the person by whom and the person to whom the communication is made must have an interest or duty in respect of the matter in order to render it a qualifiedly or conditionally privileged communication: 33 Am. Jur., p. 127.

 Generally, where alleged defamatory material is published privately and confidentially in response to an inquiry made by the party allegedly defamed or his authorized agent, it is qualifiedly privileged if it does not go beyond the scope of the inquiry: 33 Am. Jur., pp. 127–128; 33 Ill. L. and P., p.

377

391. Ordinarily, also, a qualified privilege attaches to statements and communications made in connection with the various activities of such organizations as lodges, societies, labor unions, etc.: 33 Am. Jur., p. 131. It is clearly settled that a communication respecting the character of an employee or former employee is qualifiedly privileged if made in good faith by a person having an interest or duty in the premises to one also having an interest or duty in the premises: 33 Am. Jur., p. 168. The privilege may be lost, of course, if the communication goes beyond the defendant's interest or duty in the matter: 33 Am. Jur., p. 176.

 The general principles as to qualifiedly or conditionally privileged communications are stated in Cook v. East Shore Newspapers, Inc. (1945) 327 Ill. App. 559, though the particular publication there involved was held not to be a qualifiedly or conditionally privileged publication. In Everett v. De Long (1908) 144 Ill. App. 496 it was held that allegedly slanderous words spoken by the defendant pastor of a church to certain members of the church and to a member of a particular official board of a church society concerning the plaintiff, a trustee of the church and the superintendent of a society subordinate to that church society, who had tendered his resignation as trustee and superintendent, and which resignations the members of the church and the particular official board had to act on, were qualifiedly privileged communications,—whether the occasion was privileged is a question of law,—the defendant as pastor had an interest in the question and a duty to aid the members of the church and the official board in coming to a correct conclusion on the subject of whether the plaintiff's resignations should be accepted,—and there was no express malice. In Anderson v. Malm (1916) 198 Ill. App. 58 it was held that allegedly slanderous words

spoken by the defendant pastor of a church concerning the plaintiff, a member of the church, at a meeting of the congregation which was considering the question of expelling the plaintiff, at which meeting the pastor was in charge, were privileged communications,—said by the defendant in the line of his duty,—and not actionable unless there was express malice,—at the close of the plaintiff's case the questions of privileged communication and express malice were questions of law for the judge and not of fact for the jury,—the occasion did not justify any inference of malice, there was no other proof thereof, and there was no error in directing a verdict for the defendant. In Wuttke v. Ladanyi (1922) 226 Ill. App. 402 the court held that allegedly slanderous words spoken by an employer privately and confidentially in good faith to a discharged employee and his union representative in explanation, at their request, of the discharge and as a duty to them, were qualifiedly privileged communications,—uttered privately for a good and proper purpose to persons having an interest in the subject matter, and reversed, without remanding, a judgment for the plaintiff. In Chaloupka v. Lacina (1939) 301 Ill. App. 173 the same conclusion was reached as in Wuttke v. Ladanyi, supra, on substantially the same facts, and the court said the question as to whether the communication is privileged is one for the Judge and not the jury, actual or express malice is not presumed but must be proved, there was no evidence of actual malice, and that there should have been a directed verdict for the defendant.

 Malice is the gist of an action for libel, or slander; there are, generally, two different kinds of malice,—malice in law, or malice in fact; malice in fact means ill will towards a particular person,—an actual intention to injure or defame him; if the case be one of a qualifiedly privileged communication the appar-

379

ently beneficial and honest occasion and circumstances are considered to afford an excuse or justification to the defendant, without regard to the truth or falsity of the communication, and in such a case an action cannot be sustained without proof of actual or express malice,—malice in fact,—if the defendant acts from honest motives and for justifiable purposes the law excuses him: Cf. Gilmer v. Eubank (1851) 13 Ill. 271; Cf. Elam v. Badger (1860) 23 Ill. 445; privileged communications are presumed not to be malicious,—the law does not imply or presume malice in such instances,—the burden of proof is on the plaintiff to show express or actual malice: McDavitt v. Boyer (1897) 169 Ill. 475; actual or express malice is not presumed but must be proved: Chaloupka v. Lagina, supra. The defendant, Florence Erdmier, the writer of the letter, was the Director of Nurses at the hospital, and in that responsible capacity was charged with supervising the care rendered by private duty nurses and other nurses to hospital patients. Her duty and interest extended not only to the patients and their welfare, but to the doctors, and to her superiors, the officers and trustees of the hospital,—her employer, and she had to keep in contact with the Nurses' Registry when necessary. The status and position of the defendant Rockford Memorial Hospital is self evident, and its duty and interest were similar to those of its Director of Nurses. Proper, customary, and necessary nursing practices and record keeping procedures as to the handling of narcotics, were matters for which the hospital and Mrs. Erdmier probably were generally responsible so far as third parties are concerned. The hospital did not hire Mrs. Judge, she was not its employee, and it could not discharge her, though as to the matters here concerned the hospital and Mrs. Erdmier probably had some general responsibility, nevertheless, to third parties, for what

380

Mrs. Judge did or did not do. The hospital, of course, was under no obligation to permit Mrs. Judge to continue to practice there, and it and Mrs. Erdmier for it were at liberty to discontinue or terminate her serving patients at that particular place at any time.

The plaintiff, Helen Judge, was a private duty registered nurse, a member, by her own choosing, of the local Nurses' Registry, and she could be and had been assigned by the Registry at any time for private duty to patients at that hospital unless Mrs. Erdmier communicated to the Registry the request that Mrs. Judge not in the future be so assigned to patients at that particular hospital.

The Nurses' Professional Registry was necessarily interested in and had duties with respect to the sending or assigning of Mrs. Judge and other registered nurses to patients' cases at Rockford Memorial Hospital and elsewhere where needed. That was the chief purpose of the Registry. It was also interested in and evidently had some duties with respect to alleged grievances or complaints by interested parties against or concerning the nurses who were members of the Registry. It had a regular Grievance or Complaint Committee, apparently a standing committee, to whom such matters, including this matter, were routinely referred. The Chairman of the private duty nurses appointed that Committee, and the chairman was chosen by the private duty nurses themselves.

The defendant Florence Erdmier did not, on her own, volunteer or initiate the preparation and sending of the letter of June 6, 1956. She had previously simply and briefly orally asked the Registry not to assign Mrs. Judge as a private duty nurse to that hospital in the future. It was only at and upon the request of the Registry itself, by its proper committee, that the letter was ever written. It was addressed and personally delivered to the Registry, through its proper

381

executive. The defendants sent no copies thereof to anyone.

Three vials of demerol, a narcotic, disappeared in some manner April 7, April 10, and May 7, 1956,—one vial on each date, each vial containing 30cc thereof. On one of those occasions, May 17th, the loss occurred towards the end of an evening shift on a floor where Mrs. Judge at the time was working. That seems to have started the difficulty. The defendant Mrs. Erdmier in the course of her duties and in conjunction with the hospital pharmacist, and perhaps others, then investigated and checked the hospital records,—the narcotics records, narcotics loss or waste reports, the nurses records as to patients, and the physician's orders, etc. records. In the course of checking the records as to Mrs. Judge, among other nurses, numerous instances were found, over several months past, where she had withdrawn narcotics from the narcotics cabinet on the floor but had not recorded any administration thereof to patients, or any waste thereof. Those included several instances of demerol, as to which Mrs. Judge here said she in fact administered it, or wasted it, but did not record such on the proper records. But, as to those instances, or some of them, the records indicate the doctor had previously ordered demerol stopped as a medication, so if Mrs. Judge's testimony in that respect were correct she evidently had in those instances, at least, not only not kept the records correctly but had violated or ignored or overlooked a doctor's orders. That seems to be the only explanation offered by Mrs. Judge at the time or in her testimony here as to her deficiencies in the indicated instances in narcotics record keeping and as to the disposition of narcotics withdrawn from the narcotics cabinet and not shown by the records as either administered or wasted. She had apparently demonstrated, in important instances, over a period of

382

some months, at least a lack of reasonable respect for or carelessness as to proper, customary, and necessary nursing practices and record keeping procedures as to the handling of narcotics. Mrs. Erdmier admonished Mrs. Judge May 20th, but did not accuse her of taking any narcotics, and evidently Mrs. Judge meekly accepted and acquiesced therein,—making no protest and no explanation at the time. Mrs. Erdmier made no effort to bring the matter to the attention of the police or narcotics authorities. She did nothing further until about June 2, waiting until after Mrs. Judge finished a case she was then on at the hospital, and not until then did she call the Nurses' Registry and orally and briefly ask that Mrs. Judge not thereafter be assigned to cases at that hospital. The letter of June 6th was written a few days later, only at the request, as indicated, of the Registry. Mrs. Erdmier had no further talks with Mrs. Judge, though Mrs. Erdmier was available and did not refuse to talk with her. Prior to the matters here involved there is no evidence of any particular controversies between Mrs. Judge and Mrs. Erdmier. Mrs. Erdmier's simple inquiry on one isolated, disconnected occasion as to whether she was afraid of a particular respirator case, and their discussion at another time of the hospital's methods of charging patients for medications seem to have been perfectly normal events arising in the routine discharge of their respective duties, and are certainly not evidence themselves of any ill will, feuding, bickering, smoldering trouble, animosity, or petty spite on Mrs. Erdmier's part.

 Circumstances did exist here, or could reasonably have been believed by the defendants to exist, from which they had an interest or duty, or in good faith believed they had an interest or duty, to make the communication in the letter of June 6, 1956 to the Nurses' Registry, which Registry had a corresponding

interest or duty in the premises, and the defendants were so situated that they evidently believed, in the discharge thereof, that they should make the communication, and they made it apparently in good faith, believing it to be true. There apparently was good faith by the defendants, an interest or duty to be upheld, a statement limited in its scope to that purpose, a proper occasion, and publication in a proper manner and to proper parties only. Even if the statements therein were not true, and even if they charged a crime, it is nevertheless a qualifiedly or conditionally privileged communication unless there was actual, or express malice, or malice in fact. Being addressed to the Nurses' Registry, it is not unlike a statement or communication made in connection with the activities of organizations like lodges, societies, labor unions, etc., and, though Mrs. Judge was not an employee as such of the hospital, it is not too different from a communication by an employer respecting the character of an employee or former employee. Further, if the Nurses' Registry can be considered the authorized agent of Mrs. Judge, a member thereof, for this purpose, and the evidence would seem almost to justify that, then the communication is one published privately and confidentially in response to an inquiry made by Mrs. Judge herself, or her authorized agent in the premises, and is qualifiedly privileged for that additional reason, since it does not go beyond the scope of the inquiry. Whether the letter was a qualifiedly or conditionally privileged communication, or not, was a question of law for the court only, not a question of fact for the jury, and we think the question was correctly determined.

Such of the authorities cited by the plaintiff on this point as we have not already referred to,—Krumin v. Bruknes (1930) 255 Ill. App. 503, Szimkus v. Ragauckas (1914) 189 Ill. App. 407, and Rausch v.

384

Anderson (1897) 75 Ill. App. 526,—are not inconsistent with our views.

██ ██ Viewing the evidence, then, in its most favorable light for the plaintiff, with all the reasonable intendments and inferences therefrom, as must be done on a motion for a directed verdict, was there any competent evidence sufficient to submit to the jury of malice in fact, or actual malice, or express malice by the defendants, or either, towards the plaintiff Mrs. Judge? This means ill will towards her,—an actual intent to injure or defame her. Malice in fact is not to be presumed. It must be proved by the plaintiff. This qualifiedly or conditionally privileged communication is presumed not to have been malicious. There was a proper cause for the writing of the letter; there was no failure to make a proper investigation; the defendants talked with Mrs. Judge; they did not accuse her of taking any narcotics; they did not mention any charges against her to the authorities; there is no evidence of singling her out unduly or harassing her unreasonably; the defendants evidently acted from honest motives and for justifiable purposes; their position, duty, and interest, and the circumstances required that something be done; they did not volunteer or initiate the letter, but sent it only upon request; they communicated with no one except the proper party, the Registry; they waited until Mrs. Judge was finished with a current case before even calling the Registry; they did not decline to talk with her afterwards; and there was no prior history of any particular controversies between them and Mrs. Judge or any prior ill will, feuding, bickering, smoldering trouble, animosity, or petty spite by them towards her. In other words, there is no evidence in the surrounding facts and circumstances, exclusive of the letter itself, tending to show malice in fact, or actual malice, or express malice.

385

Is the letter itself sufficient competent evidence tending to show malice in fact, or actual malice or express malice to require submission of the issue to the jury? We think not. The plaintiff urges that the letter imputes to the plaintiff the commission of a crime,—stealing demerol from the hospital. We believe it will not fairly bear that construction. It does not say that. Words alleged to be libelous will be given an innocent construction if reasonably susceptible thereof: La Grange Press v. Citizen Publishing Co. (1929) 252 Ill. App. 482; Dilling v. Illinois Publishing & Printing Co. (1950) 340 Ill. App. 303. She was never seen taking demerol away from the hospital. Mrs. Erdmier had never previously accused her of stealing demerol. She had never referred such a matter to the police or narcotics authorities. It can hardly be reasonably believed that Mrs. Erdmier intended, by letter, in writing, to impute to the plaintiff something neither she or anyone else had seen, something she'd never orally accused her of, and something she'd never mentioned to the authorities,—and particularly not on June 6, 1956 after permitting the plaintiff to continue nursing at the hospital the preceding 10 days or 2 weeks after Mrs. Erdmier had learned of the facts. So far as the letter contains statements of alleged factual matters,—the second, third and fourth sentences of the second paragraph primarily,— the three vials of demerol did, in fact, from the evidence, disappear, they had been in the cabinet on the floor where Mrs. Judge was, the losses occurred on shifts when she was on duty, and there were other prior incidents where, from the records, she had taken demerol from the narcotics cabinet but charted some other medication on a patient's chart,—so those statements were actually apparently true and correct. "Disappear" does not mean stolen. "Taken" does not mean stolen. In the third paragraph the alleged factual

386

matter that she had talked with Mrs. Judge was correct,—she had. As for the rest of the letter,—the first paragraph is merely an immaterial introductory recital; the first sentence of the second paragraph is not factual, but merely an expression of the defendants' preference that she not be sent on cases to that hospital in the future,—a decision or preference which apparently was entirely up to them; the balance of the third paragraph is not factual but merely an expression of opinion,—which Mrs. Erdmier was entitled to have and express, whether others agreed or not. And the last paragraph, saying that this in no way reflects upon the care Mrs. Judge has given patients, is a fair expression of good will, not ill will, and at least is hardly the thing to be expected from a defendant motivated by alleged malice in fact, actual malice, or express malice. The letter can hardly, in fairness to any of the parties, be disassociated from the surrounding facts and circumstances under which it was written, and considered merely in a vacuum, but viewing it as an independent item or in connection with the surrounding facts and circumstances it is not competent evidence of ill will towards the plaintiff, or an actual intention to injure or defame her.

Therefore, there being no competent evidence in the facts and circumstances exclusive of the letter itself, or in the letter itself, tending to show malice in fact, or actual malice, or express malice the court was required to allow the motion for a directed verdict: Anderson v. Malm, supra; Wuttke v. Ladanyi, supra; Chaloupka v. Lacina, supra; Haskell v. Perkins (1911) 165 Ill. App. 144. A representative number of the Illinois cases the plaintiff cites on this point,— Ambrosius v. O'Farrell (1905) 119 Ill. App. 265, Ranson v. McCurley (1892) 140 Ill. 626, Zuckerman v. Sonnenschein (1871) 62 Ill. 115, Young v. Richardson (1879) 4 Ill. App. 364, Wharton v. Wright (1888)

387

30 Ill. App. 343, and Wright v. Wright (1889) 30 Ill. App. 349,—do not hold to the contrary in any situation involving a qualifiedly privileged communication similar to this, or involving facts and circumstances similar to those here present.

The judgment will, therefore, be affirmed.

Affirmed.

WRIGHT and SOLFISBURG, JJ., concur.