INTERNATIONAL ADMINISTRATORS, INC. and Sheldon Harrison, Plaintiffs,

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA, Defendant.

No. 82 C 625.

United States District Court, N.D. Illinois, E.D.

May 17, 1983.

See also 553 F.Supp. 82.

John Ruddy, Becker & Ruddy, Chicago, Ill., for plaintiffs.

William J. Holloway, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, John R. Williamson, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

International Administrators, Inc. ("IAI") and its President Sheldon Harrison ("Harrison")[1] originally filed a 12-count Complaint against Life Insurance Company of North America ("LINA"), charging interference with IAI's contractual relationships, interference with prospective advantage, breach of contract and defamation. In turn LINA filed a motion to dismiss, which this Court granted only as to Count VIII. 541 F.Supp. 1080 (N.D.Ill.1982)("Opinion I"). LINA has now moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment as to the surviving counts. For the reasons stated in this memorandum opinion and order, LINA's motion is granted in its entirety.

*Facts*[2]

Beginning in 1971 IAI was broker and administrator for various group insurance programs of the Department of Iowa of the American Legion and its Ladies Auxiliary (collectively "Iowa Legion"). In 1976 IAI solicited LINA to underwrite the AGL–270

---

1. For editorial convenience this opinion will employ the singular noun "IAI" though speaking of plaintiffs collectively.

2. As appropriate in a Rule 56 context, this factual account reflects (1) uncontroverted evidence tendered by both sides and (2) reasonable evidentiary inferences favorable to IAI. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

policy[3] for Iowa Legion members. Then a few years later IAI selected LINA as underwriter for Iowa Legion's "Cancer" and "Wheels" policies.

During the preliminary negotiations as to IAI's commissions for securing Cancer and Wheels coverage, LINA Group Manager John Haffner sent a November 22, 1978 letter to former IAI President Richard Albert ("Albert"), providing "a synopsis of our continuing discussion on these risks." That letter (dealing with such insurance for both Iowa and Illinois Legions) confirmed LINA's willingness to pay IAI, as an inducement to place the Wheels business with LINA, a "contingent commission" supplementing any commissions IAI received directly from the Legion:

> We will allow an agency contingency on Iowa and Illinois Legion Wheels policies whereby we will take 20% for our expenses profit, etc., allow you 25% commission takeover first year (30% new and 20% renewal thereafter), subtract the paid claims and IBNR (15% premium at year end) and split the remainder 50/50 until you reach 10% total additional compensation. . . .

On January 9, 1979 LINA and IAI executed a written agreement establishing a commission schedule for Cancer and Wheels coverage for several policyholders, including Iowa Legion. That contract makes no mention of any contingency fee agreement. It did however improve on IAI's position un-

der the November 22 letter "synopsis" in two ways:

> 1. Its commission rates are higher than those contemplated in the letter.
>
> 2. It provided a $50,000 advance on commissions.

Sometime in 1980 IAI replaced LINA with another insurance company as underwriter of Cancer and Wheels coverage for Iowa Legion subscribers. No other change in the relationship among IAI, LINA and Iowa Legion occurred until the fall of 1980, when IAI became more than 90 days delinquent in remitting Iowa Legion premiums in the "six figures" (Jackson Dep. 28).[4] That period of delinquency comports with neither industry custom (Roehr Dep. 33–34; Sweeney Dep. 24–25) nor IAI's past practice (Jackson Dep. 29; Harrison Dep. 60–61).[5] Indeed IAI was contractually obligated to transmit AGL–270 premiums within 45 days after the first day of the billing quarter (LINA Doc. 01809).

Through mid-March 1981 LINA repeatedly asked IAI to pay the delinquent premiums. Each time Harrison provided immediate payment (Jackson Dep. 28–29). In an undated letter received by Harrison March 18 (the "March 18 letter"), LINA Vice President Lowell Jackson ("Jackson") threatened suit if the premiums were not paid by March 23, 1981:

> Your account with I.N.A. is considerably overdue. Our records indicate non-payment of premium for the above accounts as far back as September of 1980. In

---

**3.** That policy is also known as the Hospital Income Plan or the Accident and Sickness Policy.

**4.** After IAI remitted $150,000 to LINA in January 1981 (Jackson Dep. 14) the amount of 90-day overdue premiums probably dropped below $100,000.

**5.** Under the strict regulations applicable to the insurance industry 90 days marks a critical watershed: When premiums are that long delinquent they can no longer be treated as admitted assets (thus affecting the company's balance sheet adversely) (Jackson Dep. 28–29). As to IAI's past practices in that respect, Harrison's own admissions nullify any conflicting inferences that might be drawn from the affidavit of former IAI employee Karen Kirkwood:

> During [December 1971 through February 1981] IAI consistently failed to remit premiums promptly to the companies, including LINA. There were a significant number of times when the premiums were remitted more than 90 days after the due date. All companies including LINA accepted the premium whenever submitted.

Moreover the quoted passage does not address whether IAI's untimely remittance of *very substantial premiums* is customary, so it poses no conflict with the other deposition testimony on that score. Indeed the Kirkwood affidavit underscores the absence of any disputed issue as to the untimeliness of IAI's transmissions of premiums collected from Iowa Legion members.

addition, much of this business was moved to other carriers without proper notification to us.

We must insist that all past due premiums be remited to us immediately. If we do not receive a full accounting with the appropriate premiums by March 23, 1981, we shall begin legal action to collect these accounts.

By that time LINA had decided to discontinue its dealings with IAI. To accomplish that LINA realized it must also sever its relationships with any policyholder, such as Iowa Legion, represented by IAI. Termination of AGL–270 coverage required notice to Iowa Legion 30 days before the policy's "anniversary date"—the only permissible cancellation date.[6] Believing the anniversary date to be May 1,[7] LINA felt it had to act quickly to comply with the notice requirement. Consequently Jackson sent identically-worded letters (the "March 19 letters") to two Iowa Legion officials, one of whom was Adjutant John B. Brokens ("Brokens"):

I.N.A. has provided Hospital Income coverage to members of the Iowa American Legion and its Auxiliary since May 1, 1976. During that time we have been very appreciative of our relationship with your organization. I.N.A. is a leading underwriter of American Legion insur-

ance coverages and we value the business highly.

We regret to inform you that we have not received certain premiums on policies issued to the Iowa American Legion that were due as far back as September, 1980. These premiums were collected by your broker, Mr. Sheldon Harrison of G & H Insurance Administrators, Inc., but have not been remitted to I.N.A.

We must inform you that under these circumstances it is no longer possible for us to do business with Mr. Harrison. Since he is your appointed broker, we are in a position that forces us to terminate our relationship with your organization as long as he is your representative. We regret that this action is necessary and trust you can appreciate our situation. Please accept this letter as intent to cancel Policy # AGL–270 on May 1, 1981. We will, of course, cooperate with you in every way and see that individual claims are handled properly.

Jackson was mistaken in saying the outstanding premiums reached as far back as September 1980. Three days before the March 19 letter was written LINA had received the premiums due in September 1980, though premiums due in *October* 1980 remained unremitted as of March 19 (LINA Docs. 00901 and 01324; LINA Dep. Ex. 104).[8] However Jackson's deposition (whol-

---

**6.** IAI's memorandum confuses the issue by arguing it was not delinquent in premiums on the AGL–270 policy. Even if true, that would be wholly irrelevant to LINA's right to cancel the contract on its anniversary date under the circumstances. LINA's decision to cut off all relationships reflects no more than good business sense.

**7.** While there is a factual dispute on that score, the record discloses no basis for disputing either the good faith or the reasonableness of LINA's belief:

1. By its terms the AGL–270 policy expressly designates May 1, 1976 as the "Policy Effective Date" and mentions no anniversary date. Under such circumstances a policy's effective date is generally the same as its anniversary date unless the policyholder asks for a different anniversary date (Haffner Dep. 75). And the record reveals no such request on Iowa Legion's (or IAI's) part *when LINA began underwriting the policy* (it was only

late in *1978* that Albert wrote a letter [Complaint Ex. C] to LINA claiming November 1 and not May 1 was the anniversary date).

2. In operational terms the anniversary date is significant only as marking the time that rate and coverage charges become effective. Because IAI acceded to all rate adjustments instituted by LINA (each as of May 1), it is plain both parties treated May 1 as the anniversary date. LINA could reasonably interpret that course of dealing as overriding any initial question as to the anniversary date.

3. Jackson, the principal LINA official responsible for the Iowa Legion account, specifically regarded May 1 as the anniversary date (Jackson Dep. 20). See also n. 10.

**8.** IAI Mem. 11 concedes some $35,000 in premiums were overdue at the time of the letter (and of course October-due premiums were then five months stale). Those unpaid premiums apparently covered LINA's Cancer and Wheels insur-

ly uncontroverted even inferentially) leaves no room for doubt the March 19 letters (including their mistaken assertion) were tendered in good faith:

1. For the six months preceding March 19 Jackson and other LINA officials had sought assiduously to resolve IAI's delinquency problems in an amicable manner (Jackson Dep. 29).

2. LINA's March 19 letter simply sought to convey (and explain) to Iowa Legion LINA's intention not to renew the AGL–270 policy (Jackson Dep. 20). There is no hint the letters were stimulated by a desire to sabotage IAI's relationship with Iowa Legion.[9] Indeed Jackson had no idea "what would happen" as a result of the letters and in fact did not expect the Iowa Legion "would even contact [him]" (Jackson Dep. 26).

3. In drafting the March 19 letters Jackson sought all possible sources of information on IAI, including up-to-date reports from LINA's Accounting Department (Jackson Dep. 32). That coupled with the close proximity in time (three days between LINA's receipt of the delinquent September premiums and Jackson's March 19 letters) reconfirms the bona fides of Jackson's belief he was reporting IAI's delinquency accurately.[10]

After receiving the March 19 letter Brokens telephoned Jackson and asked him to recommend a broker with whom LINA was willing to deal. Jackson "absolutely would not recommend" a specific replacement for IAI but instead suggested three possibilities, John P. Pearl and Associates, Ltd. ("Pearl")[11] and two others (Brokens Dep. 55–56, Jackson Dep. 25). After interviewing Pearl and at least one of the other two brokers, on April 1, 1981 Iowa Legion's Executive Committee chose Pearl as IAI's successor as to all insurance plans (including the Cancer and Wheels programs). There were essentially three reasons for Pearl's selection:

1. Brokens had been personally acquainted with Pearl for ten years (Brokens Dep. 18–19, 65).

2. Pearl was successfully administering Legion accounts in other states (Brokens Dep. 19, 21).

3. Pearl had a good reputation for reliability (Brokens Dep. 20–21).

No committee member was interested in retaining IAI (Brokens Dep. 43), though Iowa Legion had been satisfied with IAI's service before the March 19 letter (Brokens Dep. 61).

Though aware its position as Iowa Legion's administrator was in jeopardy, IAI made no attempt to inform Iowa Legion of the inaccuracy in the March 19 letters. In fact Albert, then an IAI consultant, frequently communicated with Brokens after March 19 without ever alluding to the mis-

---

ance plans, not the AGL–270 policy (an irrelevancy; see n. 6).

**9.** Despite IAI's strenuous arguments to the contrary, it is only necessary to ask whether a letter with that motivation would have had any different import or impact had it referred correctly to October 1980 premiums (five months past due) rather than mistakenly to September 1980 (six months past due). That question really answers itself and demonstrates the total poverty of IAI's assertion of a bad faith misrepresentation.

**10.** Jackson's inclusion of the same mistaken statement in his March 18 letter to IAI (which of course knew the true situation) is still another proof of his good faith belief in the information conveyed by the March 19 letters.

**11.** In early March 1981 Jack Pearl had raised with Jackson the possibility of Pearl's acquiring the Iowa Legion account. That informal conversation (the only pre-March 19 contact between Pearl and LINA representatives on that subject, Jackson Dep. 26) took place over dinner during a two-day seminar those companies hold annually to discuss their ongoing business relationship. Jackson Dep. 23–24 recalls the conversation this way:

> Mr. Pearl approached me one evening privately and asked—and said, "I hear you have been having trouble with Mr. Harrison.... Word is on the street." I replied, "He owes me a lot of money." He said, "What are you going to do about it?" I said, "I'm going to cancel all his business for nonpayment of premium." He said, "Would you mind if I took a run at the business?" I said, "You can always take a run at the business, Jack. That's up to you."

Jack Pearl's Dep. 8–9 confirms that account.

statement (Albert Dec. 23, 1982 Dep. 45).[12] Moreover, Harrison failed to keep appointments set by Iowa Legion to discuss IAI's continuing as administrator (Brokens Dep. 25–27).

Needless to say, the loss of Iowa Legion's patronage adversely affected IAI's profitability. According to Harrison's uncontroverted Dep. 223, IAI's commission income realized on all Iowa Legion policies approximated $100,000. But the loss of the Iowa Legion account did have some offsets:

1. IAI sold its records as to Iowa Legion subscribers to Pearl for $140,000 (LINA Dep. Ex. 5).

2. IAI's shareholders (including Harrison) received an approximately $100,000 rebate on their original purchase price of IAI stock, compensating for the decline in IAI's commission income during the period from August 1, 1980 through August 1, 1981 (Harrison Dep. 13).[13]

Holding LINA responsible for the loss of Iowa Legion's business, IAI brought this action. Its eleven remaining Complaint counts assert the following claims:

1. Counts I–V charge tortious interference with IAI's contractual relations, and Counts VI–VII allege interference with IAI's prospective advantages. Though each Count focuses on a different insurance plan administered by IAI on Iowa Legion's behalf, they share a single gravamen. Count II ¶ 6 is representative:

> Beginning in March 26, 1981, as aforementioned, Defendant communicated with Iowa and intentionally acted in a way calculated to cause damage to the Plaintiff by the use of intimidation, force, coercion, and misrepresentation and threats to the Iowa Department with the malicious intent of preventing Plaintiff from fulfilling its contract with Iowa with the intent to induce Iowa not to continue a valuable business relationship with the Plaintiff, to have Iowa transfer its insurance sponsorship from Plaintiff to John P. Pearl & Associates, a broker administrator favored by Defendant. Such acts by Defendant were without privilege and interfered with the Plaintiff's right to conduct its business.

Even though the initial word "Beginning" implies an ongoing course of action, IAI's only proffered evidence of "intimidation, force, coercion, and misrepresentation and threats" are the March 19 letters and the one telephone conversation between Jackson and Brokens that closely followed Iowa Legion's receipt of those letters.

2. Count IX is a breach of contract claim based on LINA's contingent commission proposal in its November 22, 1978 letter.

3. Counts X–XII allege LINA sent defamatory letters (including the March 19 letters) to several of IAI's clients. Those claims survived LINA's motion to dismiss only as to the March 19 letters.[14]

LINA's Rule 56 assault on those counts can now be explored.

### LINA's Summary Judgment Motion

LINA's motion advances numerous contentions, most of which have merit. To

---

**12.** It is true Harrison wrote *Jackson,* in a March 20 response to the March 18 letter that had contained the same misstatement, "our records show that the above accounts are by no means overdue as far back as September." But that indicates only the fact of an *error* in Jackson's letter, a matter not in dispute. As to the highly relevant issue whether that error was viewed by IAI as material to Iowa Legion, IAI's total failure to mention it to Iowa Legion is compelling.

**13.** Those offsets do not of course bear on the current summary judgment motion. They sim-

ply would have reduced the recoverable damages if IAI had established a viable claim.

**14.** Opinion I, 541 F.Supp. at 1083–84 found the other letters non-actionable as a matter of law under the Illinois rule of innocent construction, for they "do no more than inform the addressee that LINA 'no longer recognizes [IAI] as an authorized agent' and that LINA will discontinue insurance then in force unless the addressee chooses another 'broker/agent/administrator.'"

avoid overkill, this Court will address only the following dispositive arguments:

1. Illinois Insurance Code § 143.18 ("Section 143.18," Ill.Rev.Stat.1981, ch. 73, § 755.18) immunizes LINA from liability under Counts I–VII and X–XII—claims arising from communications pertaining to its notice of nonrenewal.

2. Illinois' conditional privilege doctrine also insulates LINA against recovery under those counts, for the record fails to support even an inference of bad faith or actual motive on LINA's part.

3. Because negotiations between IAI and LINA ultimately produced the January 9, 1979 written contract, the parol evidence rule bars assertion of LINA's November 22, 1978 contingent fee proposal—the sole basis of Count IX.

### Section 143.18

Section 143.18 provides:

**Liability of company or agents regarding statements made in notices or information.** There shall be no liability on the part of and no cause of action of any nature shall arise against any company, its authorized representative, its agents, its employees, or any firm, person or corporation furnishing to the company information as to reasons for cancellation, or nonrenewal, for any statement made by any of them in any written notice of cancellation or nonrenewal, or any other communications, oral or written, specifying the reasons for cancellation or nonrenewal, or for the providing of information pertaining thereto.

That provision is fatal to Counts I–VII and X–XII. It will be remembered those Counts attack the March 19 letters and the Jackson-Brokens telephone conversation, each conveying (1) LINA's intention to cancel the AGL–270 policy and (2) IAI's failure to remit premiums as the reason for cancellation. But those aspects of the communications are expressly protected by Section 143.18.

■ IAI disputes Section 143.18's applicability on three flimsy grounds:

1. Though Illinois common law applies to this lawsuit, Iowa's (not Illinois') Insurance Code provides the governing statutory requirements.

2. Section 143.18 was enacted as part of Public Act 79–686 (the "Act"), whose "lead" section—Section 143.11—says the Act does not extend to "life, *accident and health,* and ocean marine policies" [15]—an exclusion that concededly covers AGL–270.

3. Section 143.18 is inapplicable because only statutes regulating group insurance could possibly control this action.

Each contention is capable of swift disposition:

1. Opinion I, 541 F.Supp. at 1082 held "Illinois law provides the substantive rule of decision." [16] IAI concedes that proposition as to all case law matters; its Mem. 5 says:

Plaintiff agrees that Illinois common law controls in this law suit. . . .

IAI adduces no authority for splitting off the legal principles established by Illinois *cases* from those established by Illinois *statutes.* No principled distinction can be drawn in that respect: If the Illinois

---

**15.** Section 143.11 mandated the inclusion of cancellation provisions in insurance policies other than the excluded categories.

**16.** All the counts currently at issue involve tort claims, as to which Illinois choice of law rules look to the jurisdiction having the most significant contacts with the case. *Ingersoll v. Klein,* 46 Ill.2d 42, 262 N.E.2d 593 (1970). Several jurisdictions are potentially implicated here: IAI is an Illinois corporation; its principal offices and executives were Illinois-based when it originally made its deals with LINA and Iowa Legion, continuing at least through the late summer of 1980 (though it appears Harrison was Texas-based in the spring of 1981); the IAI-Legion agreements embraced both Illinois and Iowa; and LINA's home office was in Pennsylvania, from which the offending March 1981 communications emanated (though its prior negotiations with IAI were carried on by LINA's Chicago office). Certainly there is a substantial basis for viewing Illinois as the "center of gravity," and as the text of this opinion reflects both litigants acknowledge Illinois as the source of substantive law (at least for case law purposes).

courts may confer tort rights of action (and are relied on to do so by IAI), the Illinois legislature may limit those rights of action—as it has done in Section 143.-18.

2. "Lead" Section 143.11's exclusion of policies like AGL–270 cannot be impliedly engrafted upon Section 143.18. Several other Act provisions are expressly limited to insurance policies "to which Section 143.11 applies," demonstrating the General Assembly knew how to do so when it wishes. Other provisions of the Act single out particular types of policies for special treatment as to cancellation. By contrast Section 143.18 contains no such limitation of either kind. On the contrary its sweeping language ("*any* company, its authorized representative, its agents, its employees, or *any* firm, person or corporation") confirms its unfettered scope. Indeed Section 143.18 is found in Illinois Insurance Code Article IX, entitled "Provisions Applicable to *All* Insurance Companies."

3. Statutes addressed to group insurance plans are of course one (but not the sole) source of legal precepts governing breach of *contract* claims involving the interpretation of such plans. It is however frivolous to assert those statutes impliedly preempt statutory and judicial authorities that define an insurance company's *tort* liability in connection with group insurance policies.

Accordingly Section 143.18 bars all IAI's now-existing claims other than Count IX.

### Conditional Privilege

■ But even were the conclusion otherwise—even were Section 143.18 wholly inapplicable—Counts I–VII and X–XII could not survive. All those counts are also foreclosed by Illinois' doctrine of conditional privilege. *Zeinfeld v. Hayes Freight Lines, Inc.,* 41 Ill.2d 345, 349, 243 N.E.2d 217, 221

(1969) (quoting *Judge v. Rockford Memorial Hospital,* 17 Ill.App.2d 365, 376–77, 150 N.E.2d 202, 207 (2d Dist.1958)) provides the classic exposition of that principle:

> Where circumstances exist, or are reasonably believed by the defendant to exist, from which he has an interest or duty, or in good faith believes he has an interest or duty, to make a certain communication to another person having a corresponding interest or duty, and the defendant is so situated that he believes, in the discharge of his interest or duty or in the interests of society, that he should make the communication, and if he makes the communication in good faith, under those circumstances, believing the communication to be true, even though it may not be true, then the communication is qualifiedly or conditionally privileged, even though the defendant's interest or duty be not necessarily a legal one but only moral or social and imperfect in character.

Originally developed in defamation cases, the concept has been extended to tort claims of interference with contractual relations and prospective business advantage. *American Pet Motels, Inc. v. Chicago Veterinary Medical Ass'n,* 106 Ill.App.3d 626, 633–34, 62 Ill.Dec. 325, 331, 435 N.E.2d 1297, 1303 (1st Dist.1982) (prospective business advantage claims); *Gasbarro v. Lever Brothers Co.,* 490 F.2d 424, 426 (7th Cir. 1973) (Illinois' conditional privilege defense applies to "a tort action for interference with contract or other business relationships, or for defamation. . . .").

LINA has plainly satisfied the conditional privilege requirement: a reasonable or good faith belief that (1) it had "an interest or duty" to make the challenged communication and (2) the substance of the communication was true.[17] As for the first element, the record conclusively shows the March 19

---

17. This latter condition is coextensive with the "actual malice" constitutional standard announced in *New York Times v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964) in the defamation area. *See Allen v. Ali,* 105 Ill.App.3d 887, 891, 61 Ill.Dec. 678, 681, 435 N.E.2d 167, 170 (1st Dist.1982); *Gasbarro,* 490 F.2d at 426. For that reason this Court need not address LINA's assertion such First Amendment protections apply directly to this case.

correspondence furthered LINA's "interests or duties": [18]

1. LINA sent those letters to protect its legitimate interests in (a) ensuring timely receipt of premiums and (b) cancelling policies for which premium remittances were delinquent.

2. In light of its obligation under the AGL–270 policy to transmit advance written notice of its intention not to renew, LINA had a duty to send those letters once it decided to terminate its relationship with IAI.

As for the second element, this opinion has already found no genuine issue of material fact contesting LINA's good faith belief in the truth of its disclosures in the March 19 letters. More than that, the specific statement now under attack was substantially true—the untransmitted premiums had been overdue for a significant period of time. It is absurd for IAI to urge the one-month overstatement of the delinquency period rendered that statement false in any material sense (see nn. 9 and 12 and surrounding text).[19] Cf. *Kilbane v. Sabonjian*, 38 Ill.App.3d 172, 175, 347 N.E.2d 757, 761 (2d Dist.1976) (defense of truth defeats defamation claim so long as "gist or sting" of the challenged statement is accurate). In sum, LINA's conditional privilege also shields it from liability on Counts I–VII and X–XII.[20]

## Count IX

██ It only remains to determine the fate of Count IX. As already stated, that Count is based on the November 22, 1978 letter in which LINA unilaterally offered IAI a contingency fee arrangement while negotiations were still in progress.

But those negotiations culminated in the January 9, 1979 contracts. Consequently the November 22 document cannot establish an enforceable contractual obligation for two reasons:

1. Illinois' parol evidence rule bars consideration of the November 22 letter because the January 9 contract was an integrated document embracing the sub-

---

**18.** If the *fact* of such interests and duties is uncontroverted, it follows a fortiori LINA perceived reasonably and in good faith that its March 19 communications would accord with those interests and duties.

**19.** IAI impugns LINA's good faith on several other grounds as well:

1. LINA's March 19 letters were written four days before the March 23 deadline LINA had previously set (in the March 18 letter) for its institution of suit if all unpaid premiums had not been paid.

2. IAI "remitted and/or accounted for" (IAI Mem. 12) all overdue premiums before expiration of that deadline.

3. Cancellation of the AGL–270 policy was threatened even though no premiums were overdue on that particular insurance plan.

4. LINA's March 19 letters were premature because the AGL–270 policy could not have been cancelled until November 1—the true anniversary date.

5. LINA never sent IAI a copy of the March 19 correspondence.

Again IAI's positions scarcely deserve discussion:

1. LINA's notification it would file suit in case of continued nonpayment did not even intimate its willingness to continue dealing with IAI were the deadline met.

2. IAI adverts to no record support for its assertion that all overdue premiums were remitted by March 23. In any event, that assertion is irrelevant, for IAI concedes (and the record corroborates) at least $35,000 in premiums were outstanding as of March 19.

3. Irrelevancy of the specific status of the AGL–270 policy premiums has already been discussed (see n. 6).

4. This opinion has also dealt with the bona fides of LINA's belief May 1 was the anniversary date (see n. 7).

5. LINA had no obligation to send IAI a copy of the March 19 letters—another red herring. Nonetheless it did notify IAI of its intention to terminate business relations shortly after the March 19 letters were sent.

**20.** It may also be observed that law of the case considerations entitle LINA to judgment on Counts I–VII. Opinion I, 541 F.Supp. at 1082 held interference with IAI's contractual relations caused by the March 19 letters was privileged under *Connaughton v. Gertz*, 94 Ill. App.3d 265, 269, 49 Ill.Dec. 838, 841, 418 N.E.2d 858, 861 (1st Dist.1981). That holding defeats Counts I–V on the present record. Because the *Connaughton* privilege doctrine also extends to interference with prospective advantage claims (see *Belden Corp. v. Internorth, Inc.*, 90 Ill.App.3d 547, 552, 45 Ill.Dec. 765, 769, 413 N.E.2d 98, 102 (1st Dist.1980)), the same holding is equally fatal to Counts VI–VII.

ject matter addressed in the November 22 letter. *World Insurance Co. v. Smith,* 28 Ill.App.3d 1022, 1025, 329 N.E.2d 518, 520 (1st Dist.1975) confirms the applicability of that doctrine:

> The law is clear in Illinois that, as between parties to an instrument, extrinsic evidence is inadmissible to vary, alter, or contradict a written instrument which is complete, unambiguous, valid and unaffected by fraud, duress, mistake, or illegality. (See *Spindler v. Krieger* (2nd Dist.1958), 16 Ill.App.2d 131, 139, 147 N.E.2d 457; 18 I.L.P. Evidence § 251.) The written contract is conclusively presumed to include all the material terms, and all prior negotiations are merged into that agreement. The intention of the parties must be ascertained, if possible, from language employed in the contract itself. Where there is no ambiguity in the language of the contract, the court should not consider extrinsic facts in determining the intention of the parties. *Zimmerman v. Schuster* (2nd Dist.1957), 14 Ill. App.2d 535, 543, 145 N.E.2d 94; 18 I.L.P. Evidence § 255.

2. Under conventional contract principles of offer and acceptance, the making and acceptance of the later offer that became the executed January 9 contract implicitly revoked the earlier November 22 offer. Of course the terms of the later offer were different. And the fact that some of those terms enhanced IAI's remuneration in other (offsetting) respects reinforces the conclusion the contingency fee proposal had been jettisoned.

Count IX too must fail.

### Conclusion

There is no genuine issue as to any material fact, and LINA is entitled to a judgment as a matter of law as to each of Counts I–VII and IX–XII. LINA's summary judgment motion is therefore granted. At this point LINA's two-count Counterclaim presents the only remaining claims in this action (see 553 F.Supp. 82 (N.D.Ill. 1982)).