TROY L. VICKERS, Plaintiff-Appellant, v. ABBOTT LABORATORIES *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—97—3874

Opinion filed September 30, 1999.—Rehearing denied November 16, 1999.

Patrick M. Ouimet, of Sarles & Ouimet, of Chicago, for appellant.

Daniel J. Reidy and Michael J. Gray, both of Jones, Day, Reavis & Pogue, of Chicago, and Annie A. Goldberg, of Abbott Laboratories, of Abbott Park, for appellees.

JUSTICE BUCKLEY delivered the opinion of the court:
Plaintiff, Troy L. Vickers, brought suits against Abbott Laborator-

ies (Abbott) and Abbott employees Debbie Lindberg-Geiser, Nellie Lopez, Jeanice Walker, Diane Mielke, Rudy Sundberg, and Don Albert. Plaintiff alleged defamation, breach of contract, intentional infliction of emotional distress, and tortious interference with prospective economic advantage due to an Abbott investigation into allegations that he exhibited sexually harassing behavior. The circuit court granted defendants' motion for summary judgment and dismissed plaintiff's suit with prejudice. Plaintiff appeals and maintains the following: (1) the circuit court erred in granting summary judgment on plaintiff's claim for defamation because no qualified privilege existed, and if a privilege did exist, defendants abused it; (2) the circuit court erred in granting summary judgment on plaintiff's breach of employment contract claim because defendants conducted an unfair investigation into the sexual harassment allegations; (3) the circuit court erred in granting summary judgment on plaintiff's claim for intentional infliction of emotional distress where the evidence demonstrated outrageous conduct on the part of the defendants; (4) the circuit court erred in granting summary judgment on plaintiff's claim for intentional interference with economic advantage; and (5) the circuit court erred by refusing to allow plaintiff leave to supplement the record.

## FACTS

The pleadings and depositions reveal the following facts relevant to this appeal: In May 1967, plaintiff began work with Abbott as a technical advisor earning approximately $14,000 per year. Over the next 25 years, he received a number of promotions and eventually attained the position of manager of the microbials department in Abbott's chemical and agricultural products division (CAPD), earning an annual salary of $103,662.

On September 30, 1992, Debbie Lindberg-Geiser, a secretary in plaintiff's division, e-mailed a female manager, Janet Dewitt, about a manager who had been making remarks of a sexual nature to her. Later, while discussing the matter in person, Lindberg-Geiser told Dewitt that plaintiff was the manager who had told her how she looked in her clothing, talked of nude beaches in California, said that she "made him hot," and made other comments of a sexual nature.

Dewitt informed Lindberg-Geiser's manager, Sheldon Bernsen, about the issue. Bernsen contacted Lindberg-Geiser to discuss the matter and then notified defendant Rudy Sundberg, the divisional vice president for CAPD, who was both Bernsen and plaintiff's supervisor. Pursuant to Abbott policy, Sundberg met with CAPD human resources director Jeff Hogenmiller, who assigned defendant Don Albert to investigate the matter.

On October 7, 1992, Albert scheduled a meeting with Lindberg-Geiser to discuss her concerns. At this meeting she told Albert about plaintiff's conduct. He asked if anyone could corroborate any of plaintiff's statements, and Lindberg-Geiser replied that defendant Diane Mielke was present for some of the remarks. Albert also told her that he would be available to listen if other employees wished to speak with him.

After her meeting with Albert, Lindberg-Geiser contacted several of plaintiff's former secretaries, including Donna Brown, defendant Nellie Lopez, defendant Jeanice Walker and Nancy Ashley, to see if they would like to speak with Albert about their experiences with plaintiff. Defendants Walker, Lopez and Mielke indicated that they would speak with Albert. Then, as part of the Abbott investigation, Albert interviewed Dewitt, Bernsen, Walker, Mielke and Lopez concerning plaintiff's conduct. Plaintiff was in Africa on a business trip at this time.

In separate meetings with Albert, Walker and Lopez described numerous instances of plaintiff's sexually harassing conduct and of his abusive behavior toward subordinates, such as yelling and throwing objects. Albert also met with Mielke and learned that she had witnessed both the sexual remarks plaintiff made to Lindberg-Geiser and his abusive behavior.

At this time, Albert was aware that other Abbott employees had also experienced problems while working with plaintiff. In fact, prior to the Abbott investigation, several of plaintiff's subordinates (John Kane, Jim Brookshire, Ralph Hodash, Fred Woodman and Donna Brown) sought Albert's informal advice regarding plaintiff's management style. Each individual requested that the conversations be confidential and that no official action be taken. Albert had never pursued any of these complaints because none involved allegations of sexual harassment or discrimination.

On October 23, 1992, Albert met with Sundberg, Hogenmiller and Tom McNally, president of CAPD, to advise them of the status of the investigation. They discussed several options, including termination, suspension and removal from management, but decided to wait and gather more information. Pending resolution of the investigation, however, Albert and Sundberg suspended plaintiff with full pay and benefits. The record does not show that they revealed the identity of any witnesses interviewed to plaintiff.

On October 28, 1992, Albert and Sundberg met with plaintiff at his request. Plaintiff provided a rebuttal and identified the individuals he thought might have had problems with him. While almost every person plaintiff named had already given statements to the investiga-

tors, Albert and Sundberg still had not yet revealed their identities to plaintiff.

Upon completion of the Abbott investigation, Albert, Sundberg, Hogenmiller and McNally met and concluded that there was ample evidence supporting Lindberg-Geiser's allegations. According to CAPD management, this conduct constituted a violation of Abbott's sexual harassment policy warranting disciplinary action. Management also concluded that plaintiff's harsh treatment of subordinates had been improper.

Consequently, on November 2, 1992, Albert and Sundberg met with plaintiff and advised him of their decision. They told plaintiff that he could not remain in his current position as manager of the microbials department, or any other similar "Grade 20" position, because such positions required the supervision of other employees. Therefore, they offered plaintiff a senior planning position, which did not require the supervision of other employees.[1]

On November 30, 1992, pursuant to Abbott personnel policy number 222 (policy 222), plaintiff appealed his reassignment directly to Robert Beck, corporate vice president-personnel, the highest stage of Abbott's five-level appeal process. Beck contacted McNally and Charles Brown to form a committee that could review the appeal. The committee issued a decision on January 19, 1993, and determined that the transfer of plaintiff to a nonsupervisory position was appropriate.

Plaintiff initially filed an Illinois Department of Human Rights claim but then dismissed it and filed a verified complaint in the circuit court of Cook County on June 15, 1993. On September 30, 1993, plaintiff filed a first amended verified complaint alleging defamation (count I) against all defendants, breach of an implied contract (count II) against Abbott, and intentional infliction of emotional distress (count III) and intentional interference with prospective economic advantage (count IV) against Abbott, Albert and Sundberg. In addition, paragraph 42 of the complaint alleged that the defendants "were motivated to harm Plaintiff's reputation and professional career *** because Plaintiff is a Black African American."

On April 24, 1997, defendants filed a motion for summary judgment pursuant to section 2—1005(c) of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2—1005(c) (West 1996)), that stated the following: (1) all of plaintiff's claims were linked to his claim for race discrimination and were preempted by the Illinois Human Rights Act (775 ILCS 5/1—101 et seq. (West 1996)), and (2) if the claims were

---

[1]Plaintiff's salary in this new position was $94,860 annually, a reduction of $8,802 from his previous salary.

not preempted, there were no genuine issues of material fact and defendants were entitled to judgment as a matter of law. On June 30, 1997, the circuit court dismissed plaintiff's lawsuit because it contained repeated and specific allegations of race discrimination and was preempted by the Illinois Human Rights Act. However, the court did allow plaintiff an opportunity to amend the complaint.

On July 9, 1997, plaintiff filed a second amended verified complaint. This complaint attempted to substantively change counts III and IV by adding the secretaries as defendants.[2] However, on July 11, 1997, the trial court entered an order *nunc pro tunc* stating that its June 30 ruling should instead be treated as a ruling pursuant to section 2—619 of the Code (735 ILCS 5/2—619 (West 1996)) and that it would consider the remainder of defendants' summary judgment arguments.

On July 18, 1997, the court granted defendants' motion for summary judgment and entered final judgment for all defendants as to each count of plaintiff's first and second amended verified complaints. Plaintiff filed a motion to reconsider, which the circuit court denied on October 15, 1997, and this timely appeal followed.

## ANALYSIS

### I. STANDARD OF REVIEW

■ Summary judgment shall only be granted if the pleadings, depositions and admissions, together with the affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1996); see *Bass v. Prime Cable of Chicago, Inc.*, 284 Ill. App. 3d 116, 121 (1996). However, where material facts are disputed, the trial court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from the facts presented in favor of the nonmovant. *In re Estate of Hoover*, 155 Ill. 2d 402, 410-11 (1993). While "the summary judgment procedure is to be encouraged as an aid in the expeditious disposition of a lawsuit [citation], it is a drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt. [Citations.]" *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986). We review the circuit court's grant of a motion for summary judgment *de novo*. *Estate of Hoover*, 155 Ill. 2d at 411.

### II. DEFAMATION

Plaintiff first contends that the circuit court erred in granting

---

[2]Specifically, defendants objected to the addition of the four female defendants to counts III and IV, arguing that addition of the parties was barred by the statute of limitations.

defendants' motion for summary judgment as to count I of plaintiff's complaint because the evidence conclusively revealed that the statements made by defendants Walker, Lopez, Lindberg-Geiser and Mielke were defamatory *per se*, and even if a privilege was applicable under the facts of this case, the issue of whether defendants abused the qualified privilege presented a question of fact for a jury.

A. Defamation *per se*

■ To prove defamation, a plaintiff must show that the defendant made a false statement about him, that there was an unprivileged publication to a third party with fault by the defendant, and that the publication damaged plaintiff. *Cianci v. Pettibone Corp.*, 298 Ill. App. 3d 419, 424 (1998); *Pandya v. Hoerchler*, 256 Ill. App. 3d 669, 673 (1993). Proof of publication requires that the defamatory statements were communicated to some person other than the plaintiff. *Beauvoir v. Rush-Presbyterian-St. Luke's Medical Center*, 137 Ill. App. 3d 294, 300-01 (1985). Published statements can be either defamatory *per quod*, *i.e.*, requiring extrinsic facts to explain the defamatory character of the statements, or defamatory *per se*. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 10 (1992). A statement is defamatory *per se* if the words used are obviously harmful to the plaintiff's reputation because they impute to the plaintiff the commission of a criminal act, the lack of ability in a person's performance of his profession or business, or a want of integrity in the discharge of his office or employment. See *Costello v. Capital Cities Communications, Inc.*, 125 Ill. 2d 402, 414 (1988). Since we are reviewing the circuit court's grant of defendants' motion for summary judgment, we will view the facts in favor of the plaintiff and assume that statements made by the defendants during the course of the Abbott investigation were defamatory *per se*. However, as the trial court granted summary judgment on count I because the statements at issue were privileged and there was no evidence presented that the privilege was abused, we will now proceed to the issues of qualified privilege and whether the privilege was abused.

B. Qualified Privilege

Plaintiff argues that there "is no privilege which permits an employee to defame and intimidate another under a guise of unlawfully interfering with another's prospective economic advantage." This argument assumes bad faith on the part of defendants.

■ " ' "A privileged communication is one which, except for the occasion on which or the circumstances under which it is made, might be defamatory and actionable ***." ' " *Kuwik v. Starmark Star*

*Marketing & Administration, Inc.*, 156 Ill. 2d 16, 24 (1993), quoting *Zeinfeld v. Hayes Freight Lines, Inc.*, 41 Ill. 2d 345, 349 (1968), quoting *Judge v. Rockford Memorial Hospital*, 17 Ill. App. 2d 365, 376 (1958). The qualified privilege, in particular, effectuates the policy of facilitating a free flow of information so that correct information may ultimately be attained. *Kuwik*, 156 Ill. 2d at 24. Where no qualified privilege exists, the plaintiff only has to show that the defendant acted negligently in making defamatory statements. *Kuwik*, 156 Ill. 2d at 24. However, once a defendant establishes a qualified privilege, to prevail the plaintiff must prove that the defendant either intentionally published the material in question and knew the matter was false, or displayed a reckless disregard as to the falsity of the matter. *Kuwik*, 156 Ill. 2d at 24. The Illinois Supreme Court has adopted the Restatement (Second) of Torts approach to determining whether a qualified privilege exists.[3] *Kuwik*, 156 Ill. 2d at 25-27; Restatement (Second) of Torts §§ 593 through 599 (1977). This approach points to three classes of communications that are conditionally privileged: (1) those involving some interest of the person who published the defamatory matter; (2) those involving some interest of the person to whom the matter is published or a third party; and (3) those involving a recognized public interest. See 2 F. Harper, F. James & O. Gray, Torts § 5.25, at 216 (2d ed. 1986); see also Restatement (Second) of Torts §§ 594, 595 (1977).

In *Kuwik*, the supreme court used this analysis to find that statements made by insurance company representatives to both its insured and the Illinois Department of Insurance that the plaintiff had acted outside the scope of her chiropractor's license were protected by the qualified privilege as a matter of law. *Kuwik*, 156 Ill. 2d 16. The court concluded that the defendants and third parties all had a compelling interest in knowing whether or not plaintiff was acting within the scope of her license. In fact, these statements were found to be privileged despite one defendant admitting that he sent a letter concerning the plaintiff without ever conducting an investigation.

In the instant case, plaintiff's brief refers to the following communications: statements made by a secretary to a member of Abbott management; statements made by the secretary to Abbott's human resources personnel that she was being subjected to sexually harassing remarks by plaintiff; statements made by defendants Walker and Lopez to the investigator that plaintiff had sexually harassed them

---

[3]In *Kuwik*, the Illinois Supreme Court discarded the five-part test previously applied to the issue of qualified privilege and adopted the approach articulated in the Restatement (Second) of Torts. *Kuwik*, 156 Ill. 2d at 25-27; Restatement (Second) of Torts §§ 593 through 599 (1977).

and employed an abusive management style; and statements by defendant Mielke that she had witnessed plaintiff's conduct toward Lindberg-Geiser and that plaintiff had directed abusive statements at her as well. Defendants assert that these communications are privileged because all three interests arise in the case at bar. We agree.

First, it is clear that the female defendants had an interest in stopping harassment and abuse by plaintiff. Second, Abbott and its agents Albert and Sundberg had an interest in investigating Abbott employees' concerns and taking action to prevent further harassment. And third, there is a definite general public interest in eradicating sexual harassment in the workplace. In fact, all of these interests are represented in Abbott's personnel policy 388, which states in relevant part:

> "It is the policy of Abbott Laboratories to provide a dignified work environment free from sexual harassment.
>
> \* \* \*
>
> All alleged cases of sexual harassment will be investigated and may result in discipline and possible discharge.
>
> \* \* \*
>
> It is the responsibility of all managers and supervisors to maintain an environment free of sexual harassment in their area of immediate responsibility. Employees and/or managers and supervisors of employees must report any incident of sexual harassment to Personnel.
>
> It is the right and responsibility of all employees to report situations which may involve sexual harassment. Each report will be confidential to the greatest extent possible, and the employee will be protected from any negative consequences directly relating to reporting the incident."

A recent United States Supreme Court decision governing sexual harassment in the workplace has made clear that there is a compelling interest in ridding workplaces of sexual harassment and, specifically, an obligation of employers to " 'take all steps necessary to prevent sexual harassment from occurring' " and "to establish a complaint procedure 'designed to encourage victims of harassment to come forward.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 806, 141 L. Ed. 2d 662, 688, 118 S. Ct. 2275, 2292 (1998), quoting 29 C.F.R. § 1604.11(f) (1997). The qualified privilege in the defamation context promotes this social policy and provides protection for the victims, witnesses and investigators of sexual harassment. If no privilege existed, then victims of harassment and companies with a goal of preventing harassment would be "handcuffed" by a fear of defamation liability. See *Thomas v. Petrulis*, 125 Ill. App. 3d 415, 421-22 (1984) (finding that "important policy considerations weigh in favor of

protecting the statements in an EEOC charge with an absolute privilege").

Plaintiff cites two cases for the proposition that the privilege does not protect "a defamer's interest in interfering with another's prospective economic advantage," *Callis, Papa, Jensen, Jackstadt & Halloran, P.C. v. Norfolk Southern Corp.*, 292 Ill. App. 3d 1003 (1997), and *Mittelman v. Witous*, 135 Ill. 2d 220 (1989). In *Callis*, a law firm sought and obtained a preliminary injunction restraining an employer, a railroad company, from interfering with the attorney-client relationship of a current firm client, the railroad's employee, because the railroad had barred the law firm from representing its client at a disciplinary hearing. The appellate panel found in part that when an attorney handles a case on behalf of a client who is protected by the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq.* (1988)), the alleged defendant does not have a privilege to engage in activity designed to intimidate the client and prevent the attorney from representing his client. *Callis*, 292 Ill. App. 3d at 1013.

Plaintiff attempts to place his case within the ambit of *Callis*. We find *Callis* distinguishable on its facts. In *Callis*, the employer-defendant attempted to question the plaintiff about his pending FELA claim without his attorneys present. In upholding the circuit court's grant of a preliminary injunction against defendant, the court held that defendant's action was meant to intimidate the plaintiff. Based on the pleadings and depositions in the instant case, plaintiff has not produced any specific evidence that any Abbott employees intimidated or bullied plaintiff. Moreover, at the time of the investigation into plaintiff's conduct, he had not yet filed a lawsuit and the Abbott investigative team was conducting its investigation in accordance with Abbott personnel policies.

In *Mittelman*, the plaintiff, an attorney, alleged that a partner in the law firm where he worked falsely told the firm's board of directors that plaintiff had missed the statute of limitations in two cases. *Mittelman*, 135 Ill. 2d at 220. However, even though *Mittelman* was a pre-*Kuwik* case, the supreme court still found that the allegedly defamatory statements were privileged because the partner and the firm's board of directors had a significant common interest in the information. *Mittelman*, 135 Ill. 2d at 234-38.

Therefore, in the absence of any specific evidence to the contrary, we find that defendants' communications were covered by a qualified privilege because they meet the requirements set forth in the Restatement (Second) of Torts.

### C. Abuse of Privilege

Plaintiff next asserts that the circuit court committed error

because the question of whether the privilege was abused was a question of fact for the jury to decide, not for the trial court.

■ Once a qualified privilege is established, as it has been in this case, a communication is only actionable if the plaintiff can show that the defendant abused the privilege. *Quinn v. Jewel Food Stores, Inc.*, 276 Ill. App. 3d 861, 871 (1995). In order to satisfy this burden, the plaintiff must present evidence of a "reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties." *Kuwik*, 156 Ill. 2d at 30. The *Kuwik* decision expanded the previous definition of abuse of a qualified privilege as articulated in *Mittelman*, where the court required a showing of actual malice. Now, a court must look beyond whether a defendant knew a statement was false or had a high degree of knowledge a matter was false and, instead, examine any reckless acts leading to the defamation. See *Dawson v. New York Life Insurance Co.*, 932 F. Supp. 1509, 1528 (N.D. Ill. 1996). Plaintiff is correct when he asserts that the issue of whether a privilege was abused is a question of fact. However, once a defendant has established a qualified privilege, the plaintiff must come forward with actual evidence creating an issue of fact. Recently, in *Cianci v. Pettibone Corp.*, 298 Ill. App. 3d 419, 426 (1998), a plaintiff, who was eventually terminated from her job, sued her employer and fellow employees for falsely stating in the presence of others that she wrongfully made personal shipments via DHL courier services. During her own deposition, the plaintiff admitted to using DHL to send personal items without ever reimbursing her employer. This court affirmed summary judgment for defendants partly because the record failed to present facts indicating that the defendants acted "with an intent to injure Cianci [plaintiff] or in reckless disregard for her rights." *Cianci*, 298 Ill. App. 3d at 426.

■ While the case at bar is distinct in that plaintiff never admitted to harassing Abbott employees, the principles set forth in *Cianci* still apply. Plaintiff has denied both making comments of a sexual nature to female coworkers and having verbally abused coworkers, but he does not provide any concrete evidence to support the notion that Abbott employees fabricated stories about him. See also *Barakat v. Matz*, 271 Ill. App. 3d 662, 669-71 (1995) (affirming dismissal of defamation claim, where no genuine issue of material fact as to abuse of privilege); *Gist v. Macon County Sheriff's Department*, 284 Ill. App. 3d 367, 374 (1996) (affirming dismissal of complaint where plaintiff failed to set forth any facts showing bad faith in dissemination of a flyer). Specifically, plaintiff was only able to offer statements based on "speculation" that defendants Lopez and Walker had lied about his

conduct. His brief argues extensively that defendants Walker, Lindberg-Geiser, Lopez and Mielke desired to harm him by making false communications during the Abbott investigation. According to plaintiff, Walker made false claims about her former boss and, therefore, she must have falsely alleged sexual harassment here. Yet there is no evidence in the record of either Walker's problems with her former boss or that she lied to Abbott investigators about plaintiff. Plaintiff also asserts that either Lopez or Walker must be lying because Walker testified that she never had any conversations with Lopez about plaintiff prior to her 1995 deposition. However, this conclusion misinterprets Walker's testimony. She stated that she did not have any conversations with Lopez about plaintiff prior to her deposition but after the complaint was filed. Thus, plaintiff appears to have taken Walker's answer out of context. Furthermore, the record reflects that Abbott employees deliberately followed company personnel policies in accordance with federal law and investigated allegations into plaintiff's conduct before taking action regarding his employment status. Therefore, plaintiff has made a general argument that defendants abused the qualified privilege by failing to "properly investigate the truth" of the sexual harassment allegations without offering any factual support for this statement.

In contrast, in *Kuwik*, the Illinois Supreme Court found that a genuine issue of material fact did exist because the plaintiff offered evidence of the defendant's recklessness. *Kuwik*, 156 Ill. 2d at 31. At a deposition, one of defendant's employees testified that company policy required input from both the legal and medical departments when investigating physician licensing. Additional evidence established that only the legal department was consulted on this particular matter. As a result, the court determined that a question of fact existed as to whether the defendant was reckless because company investigatory procedures clearly were not followed.

Similarly, a federal court found a genuine issue of material fact as to abuse of a qualified privilege in *Dawson*. *Dawson*, 932 F. Supp. 1509. *Dawson* arose out of a February 1993 verdict in Texas state court that found defendant New York Life and one of its insurance agents breached their fiduciary duty and their duty of good faith, and committed fraud in certain transactions involving a policyholder and his wife. The plaintiff (Dawson) was a former general manager of New York Life's Corpus Christi, Texas, office and was the subject of both comments at a New York Life managers' meeting and a subsequently released training video. At the Texas trial, evidence was presented that management in New York Life's Texas office was aware of and had authorized the agent's misconduct. Yet there was no evidence

showing Dawson knew of or participated in the fraud or forgery at New York Life. Nevertheless, he was fired shortly after the verdict. His action in federal court for defamation, intentional interference with prospective economic advantage and intentional infliction of emotional distress followed.

The federal court's analysis in *Dawson* relied on Illinois defamation law and focused on whether "a jury could reasonably find that New York Life recklessly failed to conduct a proper investigation into whether Dawson had knowledge of, condoned, or participated in, fraud or forgery before making statements attributing such knowledge or participation to him." *Dawson*, 932 F. Supp. at 1530. The court found that since New York Life improperly relied on evidence from the Texas trial that did not directly implicate Dawson and never conducted a proper investigation into the matter before attributing reprehensible conduct to Dawson at the managers' meeting and in the training video, a jury could find that New York Life was reckless and abused its qualified privilege. *Dawson*, 932 F. Supp. at 1530; see also *Gibson v. Philip Morris, Inc.*, 292 Ill. App. 3d 267 (1997) (affirming trial court's judgment in favor of plaintiff because defendant supervisor admitted that he failed to allow plaintiff to explain the complaints against him and no investigation was ever conducted into the truth of allegations against the plaintiff).

We think that *Dawson* presented a very different case from the one at bar. Here, the record shows that Abbott employees followed the dictates of the Abbott personnel policies when they came forward with information about the plaintiff and when the investigators explored these allegations. On the other hand, in *Dawson*, it appears that employees started pointing fingers at a specific manager without ever conducting an investigation. This distinction is significant because it demonstrates that Abbott and its employees did not recklessly reach a conclusion about plaintiff's conduct in complete disregard of his rights. Defendant Albert conducted the Abbott investigation and interviewed six employees who could have witnessed inappropriate comments by plaintiff. But Albert testified at his deposition that interviewing more employees would have unnecessarily risked creating rumors. Without any evidence of recklessness similar to that in *Dawson*, we cannot find the existence of a genuine issue of material fact.

It is important to note that employees are not entitled to investigations of their own choosing. See *Larson v. Decatur Memorial Hospital*, 236 Ill. App. 3d 796, 802-05 (1992) (cautioning courts against overanalyzing employer investigations). The important issue in a defamation suit is whether defendant's investigation was so deficient that it was conducted in reckless disregard of plaintiff's rights. See *Harrel*

*v. Dillards Department Stores, Inc.*, 268 Ill. App. 3d 537, 544-45 (1994). When "determining whether factual issues exist for purposes of a summary judgment motion," the court of review "must ignore personal conclusions, opinions and self-serving statements and consider only facts admissible in evidence." *Reuben H. Donnelley Corp. v. Krasny Supply Co.*, 227 Ill. App. 3d 414, 421 (1991), citing *Certified Mechanical Contractors, Inc. v. Wight & Co.*, 162 Ill. App. 3d 391 (1987). While a plaintiff need not prove its entire case at the summary judgment stage of proceedings, it bears the burden of presenting a factual basis that would entitle it to judgment. See *Reuben H. Donnelley*, 227 Ill. App. 3d at 421. Accordingly, for the aforementioned reasons, we find that the circuit court was correct in finding that defendants did not abuse the qualified privilege. We also conclude that the circuit court did not err in granting defendants' motion for summary judgment on count I because no genuine issue of material fact existed.

## III. BREACH OF EMPLOYMENT CONTRACT

Next, plaintiff contends that Abbott's personnel policies created an employment contract that Abbott breached when it conducted an unfair and partial investigation.

In Illinois, under the employment-at-will doctrine, employers may discharge, transfer or discipline employees for any reason or for no reason at all, as long as they do not violate clearly mandated public policy. *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 489 (1987). The supreme court has crafted an exception to this rule where "an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present." *Duldulao*, 115 Ill. 2d at 490. The court elaborated that a plaintiff must show the following to fall within this exception:

> "First, the language of the policy must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement." *Duldulao*, 115 Ill. 2d at 490.

Most cases applying the *Duldulao* test have focused on the first element—whether an employee manual contains a specific promise creating a contract. Ordinarily, the courts have found that references to

general company policy or practice are too indefinite to constitute a promise. See *Harrell v. Montgomery Ward & Co.*, 189 Ill. App. 3d 516, 522 (1989) (finding discretionary language in an employee manual too indefinite to constitute a promise). The issue of whether an employee manual constitutes an enforceable employment contract is a question of law. *Doyle v. Holy Cross Hospital*, 289 Ill. App. 3d 75, 78 (1997).

Plaintiff's second amended verified complaint alleged in count II that Abbott policies No. 222 and 388 from the employee manual created a binding contract.[4] Now, on appeal, he argues that Abbott created a binding contract but breached the terms of that contract by conducting an unfair investigation. Plaintiff's argument repeatedly points to the unfair nature of the Abbot investigation, but fails to present any facts from the record which support this assertion. His argument assumes that the Abbott investigation was conducted unfairly and then asks us to infer a breach of the terms of the employee manual.

Abbott's personnel policy 222 is a general provision entitled "Employee Problem Solving." The provision set forth the procedures for dispute resolution and the appeals process for any decisions. For example, policy 222 contains language stating that "employees are encouraged to talk with their immediate supervisor about problems" and "the employee may appeal to the Corporate Vice President." Policy 388, as set forth above in part II of this opinion, is entitled "Sexual Harassment" and is aimed at providing "a dignified work environment free from sexual harassment."

By comparison, in *Duldulao* the supreme court found that the employee handbook created an enforceable contract right because the document contained specific language regarding the termination of permanent employees. *Duldulao*, 115 Ill. 2d at 490-91. The handbook stated that termination of a permanent employee " '*cannot occur* without proper notice and investigation.' " (Emphasis in original.) *Duldulao*, 115 Ill. 2d at 491. Another provision stated that permanent employees " '*are never* dismissed without prior written admonitions.' " (Emphasis in original.) *Duldulao*, 115 Ill. 2d at 491. Therefore, an employee reading the handbook in *Duldulao* would have reasonably believed that he or she would receive a warning before termination.

■ The language in Abbott's employee manual is permissive and advisory and does not meet the first prong of the *Duldulao* test.

---

[4]His brief on appeal also refers to policies No. 100, 110, 310, 318, 344, 345, and 363. Since none of these policies were pled in plaintiff's complaint, we should find that he has waived his right to raise these policies on appeal. See *Jarke v. Jackson Products, Inc.*, 282 Ill. App. 3d 292, 297 n.1 (1996).

Furthermore, the Abbott employee manual expressly reserved the right to discipline employees, including discharge for any reason. A portion of the manual read in part, "[e]xcept for those persons who [*sic*] employment is otherwise governed by a specific employment contract, employment at Abbot is at will. Abbott and its employees have the right to terminate the employment relationship at any time, without restriction." See *Belline v. K-Mart Corp.*, 940 F.2d 184, 190 (7th Cir. 1991) (finding that where an employee handbook states that employment is at will and can be terminated at any time, a plaintiff is precluded from arguing that defendant's sexual harassment policy alters the at-will status). As a result, we find that the Abbott policies merely state general guidelines and objectives for employer-employee relations and contain no evidence of contractual rights.

Plaintiff argues in the alternative that Abbott promised its employees that it would conduct a full, fair and impartial investigation and review of its employee complaints, and that Abbott breached this promise by not revealing the names of the harassment complainants and by not conducting an impartial review of plaintiff's appeal.

▪ The duty of good faith is a principle of contract interpretation; it does not create a contract where there is none. See *Lewis v. American Airlines, Inc.*, 287 Ill. App. 3d 957, 966 (1997). In fact, Illinois does not recognize an independent cause of action for breach of the duty of good faith. *Martin v. Federal Life Insurance Co.*, 109 Ill. App. 3d 596, 607 (1982). Here, plaintiff states that the evidence presented below established the following: that Abbott refused to reveal the identity of plaintiff's accusers even though it had done so during investigations in the past; Abbott's refusal to identify the accusers deprived plaintiff of the opportunity to gather and offer evidence; and this conduct by Abbott demonstrates that its unequal treatment of plaintiff was done capriciously and arbitrarily. However, plaintiff's brief does not provide any citation to the record in support of its assertion, and there does not appear to be a policy in the Abbott employee manual that requires disclosure of harassment accusers during an Abbott investigation. In the absence of such support, we find that Abbott did not breach a duty of good faith, and as a result, the circuit court did not err in granting Abbott summary judgment on count II of plaintiff's complaint.

## IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff next contends that the circuit court erred in granting defendants summary judgment on plaintiff's claim for intentional infliction of emotional distress because of the specific nature of the conduct in this case. Defendants counter that summary judgment was properly granted because plaintiff came forth with no evidence of outrageous conduct. We agree with defendants.

■ To prove a claim for intentional infliction of emotional distress, a plaintiff must first establish the following: (1) that the defendants' conduct was extreme and outrageous; (2) that the emotional distress suffered by plaintiff was severe; and (3) that defendants' conduct was such that defendants knew that severe emotional distress would be substantially certain to result. *Tabora v. Gottlieb Memorial Hospital*, 279 Ill. App. 3d 108, 119 (1996). Under this test, the plaintiff must show that defendants' conduct goes "beyond all possible bounds of decency," but mere insult, threat or annoyance is insufficient. *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 89-90 (1976). However, courts often hesitate to find that a plaintiff has stated a claim for intentional infliction of emotional distress in employment situations. See, *e.g.*, *Lundy v. City of Calumet City*, 209 Ill. App. 3d 790, 793-94 (1991). This trend reflects a concern that everyday job stresses should not give rise to a cause of action for intentional infliction of emotional distress. *Miller v. Equitable Life Assurance Society of the United States*, 181 Ill. App. 3d 954, 957-58 (1989).

■ Plaintiff asserts that he presented "substantial evidence that the defendants' conduct was extreme and outrageous." He refers us to defendants' failure to conduct a "good faith" investigation into the allegations against him and how he was coerced into accepting a demotion. Plaintiff also states that defendants knew he was clinically depressed yet continued to subject him to humiliating and demeaning conduct.

Defendants respond by citing *Heying v. Simonaitis*, 126 Ill. App. 3d 157 (1984). In *Heying*, the employer investigated complaints about the plaintiff's personality and her antagonism of other employees, and plaintiff was eventually transferred to a different work environment. The plaintiff then voluntarily terminated her employment and sued several former coworkers, alleging intentional infliction of emotional distress. This court affirmed dismissal of the claim and found that plaintiff's coworkers were not liable for reporting conflicts with the plaintiff to a review committee because the plaintiff merely showed unavoidable job stresses. *Heying*, 126 Ill. App. 3d at 166. Defendants also rely on *Miller*. There, a plaintiff who alleged sexual harassment also made allegations of intentional infliction of emotional distress. But the court dismissed the emotional distress claim because the plaintiff failed to show conduct as outrageous as being coerced into illegal activity or an unwanted sexual relationship. *Miller*, 181 Ill. App. 3d at 958; *cf. Piech v. Arthur Andersen & Co.*, 841 F. Supp. 825, 832 (N.D. Ill. 1994) (distinguishing cases where the plaintiff showed "systematic and intentional actions designed to humiliate the plaintiff *** coercion to engage in illegal activity *** [a] coercive sexual relation-

ship *** or [a] pattern of threats of rape or death or offers of money for sex"). While plaintiff has alleged serious conduct in his complaints, the record does not support assertions of a conspiracy or a systematic effort to remove plaintiff from his managerial position. Therefore, we find that the circuit court did not err in granting defendants summary judgment as to plaintiff's claim for intentional infliction of emotional distress.

## V. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Plaintiff next contends that count IV of his second amended verified complaint properly stated a cause of action against defendants for tortious interference with his economic advantage. Specifically, plaintiff asserts that the circuit court erred in granting summary judgment on count IV to defendants because they incorrectly argued that as corporate agents they were not third parties to the employment contract.

Illinois courts have held that a corporate employer cannot interfere with its own business relationship with its employees. See *Worrick v. Flora*, 133 Ill. App. 2d 755, 759 (1971). In other words, the tort of interference with prospective advantage requires a showing of action by the defendant toward a third party. See *Williams v. Weaver*, 145 Ill. App. 3d 562, 570 (1986). In the instant case, plaintiff's second amended verified complaint does not allege that Abbott interfered with plaintiff's relationship with any third party.

Plaintiff asserts that a corporate officer can tortiously interfere with an employee's employment relationship with a corporation when the corporate officer places his own interests ahead of the corporation's interests. See *Mittelman*, 135 Ill. 2d 220. He states that in this case defendants Sundberg and Albert acted solely for their own gain and to harm plaintiff by conducting "a shoddy investigation." However, even employees acting on behalf of an employer cannot interfere with a plaintiff's business relationship. *Quist v. Board of Trustees of Community College District No. 525*, 258 Ill. App. 3d 814, 821 (1994). It appears from the record that both Albert and Sundberg were acting in good faith according to Abbott policies. Plaintiff offered no evidence to the contrary other than his own deposition testimony that he thought the investigation could have been more thorough and his "speculation" that certain defendants had a motive to lie. Moreover, even if Albert and Sundberg were acting independently, plaintiff would have to prove the following: (1) a reasonable expectation of continued employment; (2) defendants' knowledge of this expectancy; (3) interference by the defendants for the purpose of defeating this expectancy; and (4)

damages to the plaintiff resulting from the interference. See *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511 (1991). He could not prove the third prong of this test. To do so plaintiff would have to demonstrate that Albert and Sundberg's actions were unjustified and malicious. *Fellhauer*, 142 Ill. 2d 495. While plaintiff's brief repeatedly refers to Sundberg and Albert's failure to supply him with the names of his accusers and their failure to conduct a good-faith investigation, nothing in the record supports these claims. Without evidence of improper motive, it is difficult for us to infer improper motive. Therefore, we find that the circuit court did not err in granting defendants summary judgment as to count IV.

## VI. DR. LEE'S AFFIDAVIT

Finally, plaintiff argues that the circuit court committed reversible error when it ruled that the affidavit of Dr. Helen Lee was immaterial to the facts at issue in this case.

A trial court has the responsibility to determine the admissibility of evidence and this determination will not be overturned in the absence of a clear abuse of discretion. *Patch v. Glover*, 248 Ill. App. 3d 562, 567 (1993). Even if the trial court did abuse its discretion, a new trial should be ordered "only when evidence improperly admitted appears to have affected the outcome of the trial." *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 243 (1988).

In the instant case, plaintiff presented the unsigned affidavit of Dr. Lee concerning supposedly false statements defendant Walker made about her in 1989. Dr. Lee was Walker's supervisor from 1987 to 1989. Plaintiff states that this evidence was probative as to Walker's manner of dealing with her bosses. However, we agree with the trial court and find that whether or not Walker complained about a former supervisor is not material to whether she or any of the other defendants acted in reckless disregard of plaintiff's rights.

## CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court of Cook County granting defendants' motion for summary judgment as to counts I, II, III and IV of plaintiff's second amended verified complaint.

Affirmed.

ZWICK, P.J., and CAMPBELL, J., concur.